Filed 7/27/21  P. v. Core CA2/7

# NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## SECOND APPELLATE DISTRICT

## DIVISION SEVEN

| | |
|---|---|
| THE PEOPLE, | B302551 |
| Plaintiff and Respondent, | (Los Angeles County Super. Ct. No. MA072950) |
| v. | |
| RICHARD NORMAN CORE, | |
| Defendant and Appellant. | |

APPEAL from a judgment of the Superior Court of Los Angeles County, Charles A. Chung, Judge.  Affirmed.

Elizabeth K. Horowitz, under appointment by the Court of Appeal, for Defendant and Appellant.

Xavier Becerra, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Susan Sullivan Pithey, Assistant Attorney General, Steven D. Matthews and J. Michael Lehmann, Deputy Attorneys General, for Plaintiff and Respondent.

————————————

Richard Norman Core appeals from a judgment entered after a jury convicted him of second degree murder. Core drove a tractor-trailer truck that veered onto the sidewalk and hit and killed a pedestrian before crashing into a building. Core contends the trial court committed prejudicial error by failing to instruct the jury on vehicular manslaughter as a lesser included offense of murder because the failure to do so violated the Equal Protection Clause of the United States and California Constitutions (U.S. Const., 14th Amend., § 1; Cal. Const., art. I, § 7) notwithstanding the Supreme Court's holding in *People v. Sanchez* (2001) 24 Cal.4th 983, 992 (*Sanchez*), overruled on another ground in *People v. Reed* (2006) 38 Cal.4th 1224, 1228-1229, that vehicular manslaughter is not a lesser included offense of murder.

Core also argues the trial court erred in admitting course materials from a drug rehabilitation program he attended, photographs of the victim, and unreliable expert testimony. Further, he contends the prosecutor committed multiple instances of prejudicial misconduct during his closing argument. In addition, Core contends there was not substantial evidence he was subjectively aware of the danger of driving while under the influence of methamphetamine to support the implied malice murder conviction. Finally, Core requests we review the sealed record of the trial court's in camera hearing to determine whether the court disclosed all relevant complaints in response to his *Pitchess*[1] motion seeking discovery of a California Highway Patrol officer's personnel records. We affirm.

---

[1]     *Pitchess v. Superior Court* (1974) 11 Cal.3d 531, 536-538 (*Pitchess*).

2

# FACTUAL AND PROCEDURAL BACKGROUND

A.   *The Prosecution Case*

   1.   *The day before the crash*

   Core was employed by Abe's Trucking, Inc.  The owner, Abraham Gutierrez, testified his company maintained its trucks and kept them in good mechanical order because "[i]f they are not safe, they could cause an accident."  Gutierrez stated that on June 22, 2017, the day before the accident, Core picked up a load from Long Beach, California to drive it to Texas.  Core was supposed to take Interstate-10 East to get to Texas.  According to Gutierrez, Santa Clarita was not on the route.

   At about 10:00 a.m. on June 22 California Highway Patrol Officer Brian Powers and his partner Officer Clive Sheen received a call concerning a truck blocking a road lane and being "high centered in [a] parking lot" in Santa Clarita.  The truck driven by Core (a tractor-trailer) was stuck in the parking lot of a restaurant because "the trailer had gotten caught up on the high point" of the driveway.[2]  The tractor was partially blocking the number three lane of the road and the trailer was backed into the driveway.  After the officers called a tow truck, they "did the whole complete walk around of the truck."  Officers Powers and Sheen did not see anything about the truck that would make it dangerous to drive or cause it to drive off the road.

---

[2]   Officer Powers explained that a "driveway has a slight elevation and then a decline so there is a high point in there.  The truck [and] the trailer had gotten caught up on that high point, . . . what they call high centered.  So it was unable to move . . . because the front of the truck was down and the trailer was down and the middle of the trailer got stuck."

Officer Powers also reviewed Core's log book.[3] He asked Core "why there [were] discrepancies" because Officer Powers "found a receipt saying that the load was picked up at a certain time but that wasn't documented on the log book correctly." Core acknowledged "the hours didn't match up with what [Core] had in his log book." Core told Officer Powers he had gone to the current location to sleep in his truck in a sleeper berth. Officer Powers explained, "[Core] said that he had been up for a while. And like I said, it didn't coincide with what his log book said. So based on the fact that there was a bunch of inconsistencies I had to place him out of service for that." Officer Powers took Core out of service at 10:00 or 11:00 a.m. for a minimum of 10 hours.

Officer Powers, who had training in roadside impairment detection and had made over 400 arrests of people driving under the influence (DUI), did not think Core was impaired. Officer Powers testified, "[Core] was running around frantic. It was kind of a hot morning. Sweating. I didn't get any impairment at that time." But when asked if Core appeared tired, Officer Powers answered, "[H]e did appear a little bit tired but most of the time mostly he was frantic. Just running around." On cross-examination, Officer Powers reiterated that Core "seemed fatigued." Officer Powers explained what he meant by fatigued, "Just tired. [Core] said he had been working on trying to get the truck unstuck for hours. So just trying to do all that. Obviously

---

[3] According to Officer Powers, a log book "is a daily record that commercial drivers are required to do" by the federal and state governments that "documents their hours that they drive . . . so they don't get too tired and thus cause a collision because they are driving fatigued."

that is a lot of physical labor trying to move that truck. Fatigued in that way."

2. *The crash, investigation, and arrest*

The following morning, on June 23, 2017, Core was driving on Palmdale Boulevard in Palmdale when his truck jumped a sidewalk curb and hit and killed a pedestrian, Gary Burris, before crashing into a building. Los Angeles County Sheriff's Deputy Rowell Quemuel, a traffic investigator and certified drug recognition expert, arrived at the scene at approximately 6:15 that morning. Deputy Quemuel "saw a tractor trailer in a jack knifed position on the south curb line of Palmdale Boulevard." He testified, "I saw a lot of damage to business storefronts. A lot of breaks, a lot of truck damage, and also a trailer with a big cargo box on the back of it."

Core was sitting on the back of the trailer holding a lit cigarette. Deputy Quemuel allowed Core to smoke for a minute "based on [Core's] shock" but then asked him to extinguish the cigarette. At first Core "didn't do anything" and seemed to be in "a state of confusion." After a second request, Core complied. Deputy Quemuel explained, "[Core] seemed very out of it. Seemed like he was in shock. Had his head down. Seemed confused. Lost. Almost lethargic." Deputy Quemuel asked Core "if he was the driver[,] and he didn't answer." Deputy Quemuel added, "I asked him what happened and he still had his head down. Didn't seem to understand or acknowledge that I was asking him a question." Further, Core did not answer when Deputy Quemuel "asked him if he was injured and if he needed any type of medical attention." But Deputy Quemuel added, "After about three times I asked him what had happened and he

5

said to me that his truck lost control and somehow veered to the right and that's when he drove up the curb."

As part of the standard procedure for a fatal collision investigation, Deputy Quemuel asked Core to take field sobriety tests to determine whether Core was impaired. Core did not agree to take the tests despite three requests. As Deputy Quemuel explained, "The first time I remember he didn't respond to me. He had his head down. The second time he looked at me kind of in a daze. And then the third time, if I remember correctly, he asked for his lawyer." However, Deputy Quemuel acknowledged at trial the field sobriety tests were not mandatory. Deputy Quemuel also twice asked Core to take a blood test. After the second request, Core agreed to submit to the test.

Deputy Quemuel examined the accident scene "to see where the truck may have gone off the road." He did not see any obstruction in the roadway that would have caused the truck's wheels to jerk or turn. Deputy Quemuel then spoke with Core for about an hour. Deputy Quemuel explained, "Towards the end of my time with him he began to come around and acknowledge the questions that I was asking him, and that's when he finally agreed to submit to the chemical sample, the blood sample, and asked what we were going to do with his dog." Core had his dog with him tied to a leash, and he was "very concerned about his dog." Core wanted to know where his dog would go if he took a blood test. Deputy Quemuel added, "At one point towards the end of my contact with him . . . he mumbled, 'I know I messed up. I know my life is over.'"

On cross-examination, Deputy Quemuel acknowledged Core was responsive to questions about where Core was coming from, where he was going, and the street and direction he was driving. Deputy Quemuel also admitted Core seemed lethargic to

6

him in part because Core did not make eye contact. Deputy Quemuel did not suspect Core was under the influence or had ingested alcohol or drugs.

On redirect examination, Deputy Quemuel testified Core's demeanor was different from other people with whom he had spoken after a vehicle accident. Deputy Quemuel stated, "If I were to ask somebody their name or their license, registration at the scene of a collision, somebody normally would give it to me right away." He added, "Even if they were in shock. They would be a little confused but they would have an idea of what I'm asking them."

Los Angeles County Sheriff's Deputy Kyle Efflandt arrived at the scene the morning of the accident. He obtained a recorded statement from Core,[4] who stated, "I was traveling eastbound on 138, roughly 45, 40 miles an hour. I came through the intersection, I was in the right lane, and, everything appeared to be fine. I know I had some overhang. And I, I don't know what happened. I don't know if I, my load caught something on the side, or my tire caught something on the side, but the steering wheel just jerked to the right and was ripped out of my hand, and turned me into the building. That's where I ended up. I just ducked and held on." Deputy Efflandt did not note in his traffic collision report any signs that Core was under the influence of alcohol or drugs. However, Deputy Efflandt marked on the report that Core was sleepy or fatigued. Deputy Efflandt based this notation on Core's statement, in response to Deputy Efflandt's inquiry, that "he was just tired from waking up early." On cross-examination, Deputy Efflandt acknowledged he only

---

[4] The prosecutor played the video of Core's statement for the jury.

7

spoke with Core briefly.  Deputy Efflandt added, "He was just [shaken] up from the accident.  He was slow to respond and I took that as he was just involved in a serious accident."

Los Angeles County Sheriff's Deputy Eduardo Saucedo, a traffic investigator, was in charge of the traffic collision investigation.  He took photographs of the truck on the day of the crash.  Deputy Saucedo described one photograph (exhibit 13) showing "the trailer along the curb and the tractor facing southbound on the sidewalk."  The photograph also depicted white sheets on the ground that covered Burris's remains. Deputy Saucedo took another photograph of the accident scene after the tractor was removed from the sidewalk by a tow truck (exhibit 17), which he testified showed a fluid leak on the ground. Another photograph (exhibit 16) showed the remains of Burris on the sidewalk under fallen bricks from the building.[5]  Deputy Saucedo spoke with Core for "[a] few minutes" at the accident scene.  Core seemed distraught, but Deputy Saucedo did not believe Core was under the influence of any drug.[6]

Deputy Saucedo searched the truck after it was impounded. He found two eyeglass cases containing "a few bindles of methamphetamine" and two used glass pipes.  A criminalist performed a chemical analysis on the off-white solid recovered by Deputy Saucedo and determined it was 3.47 grams of a solid substance containing methamphetamine.  Two criminalists performed chemical analyses of Core's blood sample and found it

---

[5]     Deputy Saucedo described the photographs, but he did not display them for the jury.

[6]     Deputy Saucedo was previously a drug recognition expert, but he was no longer certified.

8

contained 25 nanograms per milliliter of amphetamine and 250 nanograms per milliliter of methamphetamine; it did not contain any alcohol.

Eight to 10 months after the crash Deputy Saucedo received Core's toxicology report, at which time Core was arrested. The prosecutor played a video of Core's booking for the jury. Core stated in the booking video, "I was running about 130,000 pounds, and went over a set of railroad tracks, and the load dropped, and something mechanical in the truck broke, and the cab made a hard right into a building. And it was, and [inaudible] was killed."

3.    *The truck inspections*

Alan Byrum, a California Highway Patrol motor carrier specialist with the multi-disciplinary accident investigation team (MAIT), inspected the truck and trailer in the course of two days over a year after the collision. He also reviewed the collision scene photographs from the sheriff's department and researched the truck's steering gear. In addition, Byrum ran a vehicle history report to "see if there's been any total loss or any damage reported." Further, Byrum went to a truck dealership to photograph a similar truck and to obtain information on the manufacturer's recalls.

Byrum focused his inspection "on the steering, the throttle and the brake system." He did not find any mechanical problem with the truck that would have caused it to crash. Byrum found "no deficiencies with the accelerator pedal" of the truck.  In addition, although the brake was missing a pin, this was "not enough to place the truck out of service." When Byrum inspected the truck's steering system, he noticed the bolts from the steering

9

box were broken, with the bolt heads missing.[7]  He removed the four broken bolts from the steering box and laid them on the trailer before installing new bolts to test the steering box.  The steering box worked when Byrum tested it.

Byrum sought to determine whether the bolts broke, causing the crash, or whether the truck crashed, causing the bolts to break.  He explained as to the first theory, "Had these bolts failed at the railroad track, it would have caused a severe power steering leak and there would have been a fluid trail to the collision scene and there was no fluid trail."  The prosecutor showed Byrum a photograph of the accident scene, and Byrum confirmed there was no fluid trail in the photograph, although there was fluid on the sidewalk and all over the steering gear.  As to the second theory, Byrum identified two bolts in the debris field shown in the photographs of the accident scene.  Both bolts were consistent with the kind of bolts that were used on Core's truck to close the steering box.  When asked what force would need to be applied to blow off the bolt heads, Byrum responded, "[T]he right front wheel struck something very hard which put a lot of force on the steering mechanism.  So that force was transmitted through the tie rod and through the drag link.  As the axle was pulled backwards, it thrusted this Pittman arm rearward, which caused an upward thrust of the internal mechanism in the box, which popped those four bolt heads."  The type of force necessary to blow off the bolt heads would be consistent with a collision, for example, running a truck into a post or building.

---

[7]    The photographs of the steering gear taken on the day of the crash showed it was intact; however, someone had partially disassembled it by the time Byrum conducted his inspection.

The prosecutor asked Byrum a hypothetical question in which someone was driving the truck and its steering box came apart. Byrum explained in this situation there would be "a complete disconnect, you are not going to feel anything." But if the driver feels the steering wheel jerk out of his or her hand while driving, "the steering [is] intact and there is no disconnect. That whatever is causing the front wheels to react, you are feeling it in the steering wheel."

On cross-examination, Byrum admitted he did not know what happened to the broken bolts he removed from the steering box. Byrum acknowledged that if he had the broken bolts, a metallurgist could examine them and determine whether there were preexisting fractures in the bolts before the collision. Byrum had heard of broken bolts being sent to a metallurgist, but he had never done so.

Over a year after the collision, California Highway Patrol Officer Thomas Bomar, a MAIT investigator, conducted an inspection of the truck's electronic data stored in its computer module. The computer module contains a record of a hard stop or sudden deceleration of the truck. The computer module generated a sudden vehicle deceleration report (deceleration report), a graph from which was admitted into evidence. The graph shows the truck's speed during the 60 minutes before and 10 minutes after a "sudden deceleration event," with the sudden deceleration event depicted as zero. Bomar also reviewed the reports and photographs provided by the sheriff's department and visited the accident scene. Bomar testified his "inspection was limited to imaging or copying that data and analyzing that data from the engine modules of truck."

Bomar calculated that the truck went over the railroad tracks, which were 600 to 700 feet from the accident scene, 20 to

11

21 minutes before a sudden deceleration event. At the time the truck went over the tracks, it was travelling at approximately 14 to 15 miles per hour. The truck's speed then increased to 24 miles per hour, and a minute before the sudden deceleration event, the truck's speed was travelling in the middle to high 30 miles per hour range. The truck was still running at 100 percent throttle two seconds before the sudden deceleration event. The data indicated Core did not depress the brakes until one second after the sudden deceleration event. The truck's warning lamp came on approximately six seconds after the sudden deceleration event. Bomar opined, "In this case the absence of the warning lamp in that right most column would tell me the computer of the truck basically sensed that everything was working normally or as it should be."

On cross-examination, Bomar clarified the time marked as zero on the deceleration report is "the time the vehicle speed is sensed by the computer as decelerating at least 9 miles per hour over a one-second period, but not necessarily when the impact occurs." Further, the warning lamp would only warn that something was wrong with the engine or power train. Another vehicle problem such as a blown tire would not trigger the warning lamp.

### 4. *Drug recognition expert testimony*

Anthony Marks, a professor of criminal justice and a former drug recognition expert instructor, testified for the prosecution as a drug recognition expert (D.R.E.).[8] Marks explained, "D.R.E.

---

[8] Marks indicated he usually testified for the defense, and "[p]robably in the 95 percent range is when I'm consulted by the defense first."

reconstruction is not an official term but it is a term recognized by the D.R.E. community, which is a very, very small community of law enforcement officers.  It is a term recognized by that community of individuals that look at information that is provided pursuant to somebody being under the influence, like in the instance of a crash, and look at observations by peace officers, by medical personnel, a combination of toxicology, an individual's behavior, whether it's driving behavior or behaviors during standardized field sobriety tests, and make[] a determination whether or not a substance or a chemical played a role in an individual's degree of impairment or if they were impaired during a crash."

Marks testified methamphetamine causes the release of excess dopamine in the brain, which creates a high by increasing the body's pulse, blood pressure, and temperature, and causes "fast repetitive speech, sweating, [and a] jerky kind of behavior."  To be in homeostasis, the body will produce a chemical to remove the excess dopamine, like squeezing the chemical out with a sponge.  When the dopamine is "removed," the other neurotransmitters are still present in the brain, and at that point, "instead of looking up, you can appear to be very down."  At this point the person experiences the "downside" effect of methamphetamine, which causes drowsiness as well as "confusion, an inability to pay attention, perhaps disorientation, [and] a lack of coordination."

Methamphetamine can be prescribed to treat "mild depression, attention deficit disorder, narcolepsy, [and] some eating disorders."  On cross-examination, Marks testified he was unable to determine whether the methamphetamine levels shown in Core's toxicology report fell within a therapeutic level for Core because that level is different for each person.  Further, Marks

13

opined the relevant question is whether a person is impaired, not whether he or she is taking methamphetamine at a therapeutic level, because a person "still might be impaired within a therapeutic range."

Marks opined methamphetamine-induced impairment played a role in the crash. Marks relied on observations by the deputies in their traffic collision reports indicating Core "was in a fog" and "had trouble answering questions." Marks added, "But as a result of a collision of this degree, you might expect that from somebody at first. But what I do remember in the report is that the officers made these observations over a period of time, which leads me to believe that fogginess and that haze was due to something other than the effects of the crash." Marks believed the officers made the observations over a 15- to 20-minute period. Marks admitted he did not review the video of Core's interview with the deputy. But Marks recalled the report stated Core "mumbled answers and then seemed lethargic and unaware of his surroundings." Marks admitted none of the reports stated Core was impaired or under the influence of a drug. But Marks testified, "As a reconstructionist, it's implied. . . . Inattentive, confused, mumbled answers, and lethargic and unaware of his surroundings. Those are—word for word imply impaired."

5. *Core's 2009 commercial driver license application and participation in a 2013 drug treatment program*

The prosecution introduced evidence that in 2009 Core applied for and was granted a commercial driver's license. The application contained an advisement that provides: "I am hereby advised that being under the influence of alcohol or drugs, or both, impairs the ability to safely operate a motor vehicle. Therefore, it is extremely dangerous to human life to drive while

14

under the influence of alcohol or drugs, or both.  If I drive while under the influence of alcohol or drugs, or both, and as a result, a person is killed, I can be charged with murder."  The court also admitted evidence of Core's participation in a drug treatment program in 2013 and the materials from the program.

B.    *The Defense Case*

William Focha, an accident reconstruction expert and former traffic investigator, testified on behalf of Core.  Focha inspected the truck's steering, brakes, and "what was left of the suspension system."  Focha focused on the steering because the report from the sheriff's department indicated Core said "he felt the steering wheel either get jerked out of his hand or pull in his hand."  Focha noticed the steering box differed from the photographs taken at the accident scene.  In the photographs the cap covering the input shaft had separated from the steering box, and the bolts were broken.  When he inspected the truck, "the cap was back in place and it had brand new bolts holding it in place."

Focha was unable to determine whether the bolts were broken as a result of the accident because he did not have the broken pieces to examine.  If he had the broken bolts, he would have sent them to a metallurgist or a mechanical engineer, who could determine whether the bolts had a defect prior to their failure.  On cross-examination, Focha admitted in his approximately 20 years as an accident reconstruction expert, he had never sent bolts to be tested by a metallurgist.

Focha opined that if the steering box separates while a driver is on a smooth, flat road, "he is not going to feel a lot other than heaviness in the wheel as he starts to turn the steering wheel," and he would "have a total lack of control."  If only some of the bolts break, the driver would still be able to steer the truck.

15

But if all four bolts broke, the driver would not be able to steer. Moreover, if the bolts broke, the steering box fluid would leak onto the ground. Defense counsel showed Focha a photograph of the curb where the truck came to rest at the accident scene. The photograph depicted a bolt on the ground, but Focha could not determine whether it was a bolt from the steering box because there was not sufficient definition in the photograph. Focha observed there was no steering box fluid around the bolt, which he would have expected to see if it was a bolt to the steering box. On cross-examination, Focha acknowledged that hitting a pillar or building at 20 to 30 miles per hour could cause the steering box to separate.

Focha also reviewed the electronic data Bomar obtained from the truck's engine control module. Focha testified a truck driver would typically use the clutch to start or stop the truck, but not when shifting gears. When a truck "goes into a jack knife" position,[9] the driver "is going to get slammed all around in the cab," making it hard to control the clutch, brake, or throttle. On cross-examination, Focha agreed the collision likely occurred right around zero on the deceleration report graph, when the speed precipitously dropped.

C.    *The Verdict and Sentencing*

The jury found Core guilty on count 1 of second degree murder. The trial court sentenced Core to 15 years to life on count 1 (Pen. Code, § 187, subd. (a)); 364 days in county jail on count 2 for misdemeanor possession of methamphetamine

_____

[9]    According to Focha, a truck goes into a jack knife position if the drive wheels lock up.

16

(Health & Saf. Code, § 11377);[10] and the upper term of three years on count 3 for possession of a firearm by a felon (Pen. Code, § 29800, subd. (a)(1)). The court ordered the sentences on counts 2 and 3 to run concurrent with the sentence on count 1.

Core timely appealed.

## DISCUSSION

A.      *Vehicular Manslaughter Is Not a Lesser Included Offense of Murder, and Failure To Instruct on Vehicular Manslaughter Did Not Constitute a Violation of Equal Protection*

In *Sanchez, supra*, 24 Cal.4th at page 992, the Supreme Court held gross vehicular manslaughter while intoxicated is not a lesser included offense of murder. The Supreme Court explained, "Although it long has been held that manslaughter is a lesser included offense of murder, this tradition has not explicitly included offenses requiring proof of specific elements unique to vehicular manslaughter. Unlike manslaughter generally, vehicular manslaughter while intoxicated requires proof of elements that are not necessary to a murder conviction. The use of a vehicle while intoxicated is not merely a 'circumstance,' but an element of proof when the charge is gross vehicular manslaughter while intoxicated." (*Id.* at p. 991; accord, *People v. Munoz* (2019) 31 Cal.App.5th 143, 154 (*Munoz*) ["Our Supreme Court has held that gross vehicular manslaughter while

---

[10]      Prior to trial, Core pleaded no contest to misdemeanor possession of methamphetamine and possession of a firearm by a felon. The jury therefore did not hear evidence as to Core's possession of a firearm.

17

intoxicated also is not a lesser included offense of murder under the statutory elements test."].) Like gross vehicular manslaughter while intoxicated, vehicular manslaughter requires proof of driving a vehicle, which is not an element of implied malice murder. (See *People v. Bettasso* (2020) 49 Cal.App.5th 1050, 1059 ["Because vehicular manslaughter with or without gross negligence requires proof of elements that are not necessary to the offense of murder, vehicular manslaughter (as so defined) is not a necessarily lesser included offense of murder."].)

Core urges us to reexamine *Sanchez* in light of the dissenting opinions in the case, but we are bound by the Supreme Court's pronouncement of the law. (*K.R. v. Superior Court* (2017) 3 Cal.5th 295, 308 ["'it is established that a holding of the Supreme Court binds all of the lower courts in the state, including an intermediate appellate court'"]; *People v. Johnson* (2012) 53 Cal.4th 519, 527-528 [decisions of Supreme Court are binding on appellate courts].)

Core also contends notwithstanding *Sanchez*, the failure to treat vehicular manslaughter as a lesser included offense of murder violates equal protection by treating defendants who are charged with implied malice murder based on a vehicular homicide differently from similarly situated defendants who are charged with murder and other types of manslaughter, for example based on heat of passion or unreasonable self-defense. Thus, Core argues, defendants charged with murder based on a vehicular homicide are at a disadvantage because the jury is given an all-or-nothing choice that other defendants convicted of implied malice murder do not face. We find no constitutional violation.

"The concept of equal treatment under the laws means that persons similarly situated regarding the legitimate purpose of the

18

law should receive like treatment.  [Citation.]  "'"The first prerequisite to a meritorious claim under the equal protection clause is a showing that the state has adopted a classification that affects two or more *similarly situated* groups in an unequal manner."  [Citation.]  This initial inquiry is not whether persons are similarly situated for all purposes, but "whether they are similarly situated for purposes of the law challenged."'"  (*People v. Morales* (2016) 63 Cal.4th 399, 408; accord, *Cooley v. Superior Court* (2002) 29 Cal.4th 228, 253.)

If the court finds a law treats similarly situated persons differently, we consider whether the challenged law disparately affects a suspect classification or "burdens fundamental rights." (*People v. Chatman* (2018) 4 Cal.5th 277, 288; accord, *Munoz, supra*, 31 Cal.App.5th at p. 159.)  A right is fundamental if it is "'"deeply rooted in this Nation's history and tradition," . . . and "implicit in the concept of ordered liberty," such that "neither liberty nor justice would exist if [it was] sacrificed."'"  (*Jimenez v. County of Los Angeles* (2005) 130 Cal.App.4th 133, 142, quoting *Washington v. Glucksberg* (1997) 521 U.S. 702, 720-721; accord, *Munoz*, at p. 159.)  If a law does not burden a fundamental right, "[w]e find a denial of equal protection only if there is no *rational* relationship between a disparity in treatment and some legitimate government purpose."  (*Chatman*, at pp. 288-289; accord, *Munoz*, at p. 160.)

"[T]here is no federal constitutional right of a defendant to compel the giving of lesser-related-offense instructions. [Citations.]  Further, except [in specified situations in capital cases] . . . , there is no federal constitutional right to instruction on lesser necessarily included offenses."  (*People v. Rundle* (2008) 43 Cal.4th 76, 148, disapproved on another ground by *People v. Doolin* (2009) 45 Cal.4th 390, 421, fn. 22; accord, *Munoz, supra*,

19

31 Cal.App.5th at p. 160; *People v. Wolfe* (2018) 20 Cal.App.5th 673, 688.)  Moreover, "a trial court's obligation to instruct a jury as to *lesser included* offenses is based on state constitutional law, not the federal Constitution." (*Wolfe*, at p. 688; accord, *Munoz*, at p. 160.)  Although the California Supreme Court has highlighted the importance of instructing on lesser included offenses to "prevent[] the 'strategy, ignorance, or mistakes' of *either* party from presenting the jury with an 'unwarranted all-or-nothing choice,' encourag[ing] 'a verdict . . . no harsher or *more lenient* than the evidence merits'" (*People v. Breverman* (1998) 19 Cal.4th 142, 155), we agree with our colleagues in Division 1 of the Second Appellate District that the right to an instruction on a lesser included offense is not a fundamental right for purposes of an equal protection challenge.  (See *Munoz*, at p. 162; see also *Wolfe*, at p. 688.)  Accordingly, Core's challenge is subject to rational basis review.

We need not reach whether defendants convicted of implied malice murder based on a vehicular homicide are similarly situated to those whose convictions rest on nonvehicular homicides because we conclude there is a rational basis for the Legislature's treatment of vehicular manslaughter differently from nonvehicular manslaughter.  We agree with the conclusion of our colleagues in Division 1 of this district in *Munoz, supra*, 31 Cal.App.5th at page 162, in rejecting an equal protection challenge to the trial court's failure to instruct on vehicular manslaughter as a lesser included offense of implied malice murder:  "[T]he vehicular manslaughter statutes are reasonably related to the legitimate legislative purpose of providing a wider and more nuanced range of penalties given the ubiquity of automobiles and the resulting deaths caused by motorists.  In short, the vehicular manslaughter statutes, and the

20

corresponding exclusion of vehicular homicides from the involuntary manslaughter statute, do not violate Munoz's right to equal protection of the laws." (Accord, *People v. Bettasso, supra*, 49 Cal.App.5th at p. 1059, fn. 8 ["Bettasso provides no reason for us to reject *Wolfe*'s conclusion that the differential treatment of vehicular and nonvehicular manslaughter passes rational basis review."].)

B.      *The Trial Court Did Not Abuse Its Discretion in Admitting Photographs of the Victim*

        1.      *Proceedings below*

        Outside the presence of the jury, defense counsel objected to the admission of three photographs of Burris's remains under the rubble of the building, arguing the prejudice outweighed the photographs' probative value. The People argued the photographs were relevant to show that Burris died and to explain what was under the white sheet in the photographs. The trial court overruled the objection and admitted the photographs. The court reasoned, "I have very much weighed and considered the appropriateness of admitting it. Ultimately I'm going to admit it but I want to explain why. [¶] A trial is a search for the truth. Sometime that truth is fairly benign and sometimes it's not graphic. Sometimes it is. [Evidence Code section] 352 is written such that we are searching for the truth. [¶] That line gets crossed when a prosecutor tries to inflame a jury by overemphasizing a point unduly, which is not the case here. The prosecutor is just trying to present the truth. Whether it's graphic or not, it is not of his doing. . . . And in this case the truth is graphic, unfortunately."

        The court added, "But I do agree that [the prosecutor] is walking a fine line. I think if I were the prosecutor, I would be

21

arguing to push for the video to be admitted.  I think I would want the jury to see a body essentially exploding into different pieces when a massive vehicle hits the victim full force. . . .  [¶] And this is a close case, factually speaking.  And I would fully understand if [the prosecutor] in his desire to win this case would opt for the video but he is not.  He is showing restraint and I think commendable restraint.  [¶]  For example, there are photos where you literally have the license plate embedded into mutilated flesh of the victim. . . .  [¶]  And the argument could be made, look, here is the sheer weight of the force.  That this semi truck ran into this body with such force that even the license plate got embedded into the body.  But he is not doing that either."

The court explained further, "[A]nd I have heard evidence of how the methamphetamine can actually be helpful to drivers, it can for a short duration enhance the alertness, enhance the energy level, enhance the ability to stay awake for a period of time, and as I have listened to the evidence, in my mind I thought this was going to be a very difficult case to prove beyond a reasonable doubt.  And I think in large part that's because I haven't appreciated the danger of just how big this truck was.  I have seen pictures of it and I have seen pictures of what it did to the building but I haven't really had an appreciation of just why we have these laws, why the government has even micromanaged truck drivers to the point where we want them to keep a log of how many hours they sleep . . . .  [¶]  So I think these photos, while graphic, simply do the following:  they show the truth of what happened. . . .  I don't think it's our place to sanitize life and death.  It is our place to make sure that the evidence is not inflammatory."  Moreover, "the results that are shown go to the implied malice."  As discussed, at trial, Deputy Saucedo

22

confirmed he took the three photographs of Burris's remains at the scene, but he did not show the photographs to the jury.

The prosecutor also sought to introduce a photograph of Burris while he was alive. Defense counsel indicated that would be fine "[a]s long as it's noninflammatory." Defense counsel noted, "[W]e may be able to just come up with a stipulation as to proof of life also to avoid a family member actually having to take the stand and talk about the decedent." During the trial, the prosecutor offered a stipulation between the parties that "People's exhibit 27 is a photograph of Gary Burris." Defense counsel stipulated.

### 2. *Governing law*

"'Relevant evidence is evidence "having any tendency in reason to prove or disprove any disputed fact that is of consequence to the determination of the action."'" (*People v. Hardy* (2018) 5 Cal.5th 56, 87; accord, *People v. Daveggio and Michaud* (2018) 4 Cal.5th 790, 822.) "'The court in its discretion may exclude evidence if its probative value is substantially outweighed by the probability that its admission will (a) necessitate undue consumption of time or (b) create substantial danger of undue prejudice, of confusing the issues, or of misleading the jury.' (Evid. Code, § 352.)" (*Hardy*, at p. 87; accord, *People v. Bell* (2019) 7 Cal.5th 70, 105.)

"'[T]he prejudice which exclusion of evidence under Evidence Code section 352 is designed to avoid is not the prejudice or damage to a defense that naturally flows from relevant, highly probative evidence. "[A]ll evidence which tends to prove guilt is prejudicial or damaging to the defendant's case. The stronger the evidence, the more it is 'prejudicial.' The 'prejudice' referred to in Evidence Code section 352 applies to

23

evidence which uniquely tends to evoke an emotional bias against the defendant as an individual and which has very little effect on the issues."'" (*People v. Jones* (2017) 3 Cal.5th 583, 610; accord, *People v. Bell, supra*, 7 Cal.5th at p. 105 ["'"Evidence is not prejudicial, as that term is used in [the Evidence Code] section 352 context, merely because it undermines the opponent's position or shores up that of the proponent."'"].) "'[T]he trial court is vested with wide discretion in determining relevance and in weighing the prejudicial effect of proffered evidence against its probative value. Its rulings will not be overturned on appeal absent an abuse of that discretion.'" (*People v. Hardy, supra*, 5 Cal.5th at p. 87; accord, *Bell*, at p. 105.)

3. *Core forfeited his challenge to the admission of Burris's photograph while alive, and he has failed to show ineffective assistance of counsel*

Core contends it was error to admit the photograph of Burris when he was alive because it was not relevant to any disputed issue in the case. But defense counsel indicated admission of the photograph was fine "[a]s long as it's noninflammatory." The prosecutor selected a photograph that was not inflammatory, simply showing Burris standing with another man. Further, defense counsel stipulated to admission of the photograph of Burris. Core therefore forfeited his claim of error. (Evid. Code, § 353, subd. (a); *People v. Cage* (2015) 62 Cal.4th 256, 282 ["Defendant forfeited his claims by failing to object to any of the testimony on the grounds he now raises."]; *People v. Fuiava* (2012) 53 Cal.4th 622, 721 ["'"In accordance with [section 353 of the Evidence Code], we have consistently held that the 'defendant's failure to make a timely and specific objection' on

the ground asserted on appeal makes that ground not cognizable.""""].)

Core alternatively argues that defense counsel provided ineffective assistance of counsel. """"To establish ineffective assistance of counsel, a defendant must show that (1) counsel's representation fell below an objective standard of reasonableness under prevailing professional norms, and (2) counsel's deficient performance was prejudicial, i.e., there is a reasonable probability that, but for counsel's failings, the result would have been more favorable to the defendant."""" (*People v. Rices* (2017) 4 Cal.5th 49, 80; accord, *People v. Bell, supra*, 7 Cal.5th at p. 125; see *Strickland v. Washington* (1984) 466 U.S. 668, 687-692.)

"On direct appeal, if the record "'sheds no light on why counsel acted or failed to act in the manner challenged,'" we must reject the claim "'unless counsel was asked for an explanation and failed to provide one, or unless there simply could be no satisfactory explanation.""" (*People v. Caro* (2019) 7 Cal.5th 463, 488; accord, *People v. Mickel* (2016) 2 Cal.5th 181, 198 ["[A] reviewing court will reverse a conviction based on ineffective assistance of counsel on direct appeal only if there is affirmative evidence that counsel had ""no rational tactical purpose"" for an action or omission."]; see *People v. Lopez* (2008) 42 Cal.4th 960, 972 ["[E]xcept in those rare instances where there is no conceivable tactical purpose for counsel's actions, claims of ineffective assistance of counsel should be raised on habeas corpus, not on direct appeal."].)

Here, the record shows defense counsel stipulated to the admission of the photograph to "avoid a family member actually having to take the stand and talk about the decedent." Thus, defense counsel made a tactical decision to avoid having a family member testify about Burris, potentially making Burris more

25

sympathetic to the jury.  Core has therefore not shown ineffective assistance of counsel.

4. *The trial court did not abuse its discretion in admitting photographs of Burris's remains*

"So long as the probative value of graphic or disturbing material is not substantially outweighed by its prejudicial effects, a prosecutor is entitled to use such evidence to 'present a persuasive and forceful case.'" (*People v. Merriman* (2014) 60 Cal.4th 1, 80; accord, *People v. Steskal* (2021) 11 Cal.5th 332, 357 ["Graphic evidence in a murder case is always disturbing [citation] but it is not inadmissible simply because it is unpleasant to view."]; *People v. Fayed* (2020) 9 Cal.5th 147, 196 ["As a rule, the prosecution in a criminal case involving charges of murder or other violent crimes is entitled to present evidence of the circumstances attending them even if it is grim" [citation], and even if it "duplicate[s] testimony, depict[s] uncontested facts, or trigger[s] an offer to stipulate."']; *People v. Booker* (2011) 51 Cal.4th 141, 171 [the prosecution "is not required to sanitize its evidence"].)  "'The admission into evidence of photographs lies within the trial court's discretion and will not be disturbed absent an abuse of that discretion.'" (*People v. Avila* (2014) 59 Cal.4th 496, 518; accord, *People v. Chism* (2014) 58 Cal.4th 1266, 1304.)

Core contends the trial court abused its discretion in admitting the photographs of Burris's remains, arguing they were highly prejudicial and were not probative of any disputed issue.  "A defendant, however, 'cannot prevent the admission of relevant evidence by claiming not to dispute a fact the prosecution is required to prove beyond a reasonable doubt.  The jury was entitled to learn that the physical evidence . . . supports the prosecution's theory of the case.'" (*People v. Steskal, supra,*

26

11 Cal.5th at p. 356; accord, *People v. Roundtree* (2013) 56 Cal.4th 823, 852.)

We agree the photographs are gruesome, showing body parts under the rubble from the building. But as the trial court observed, the photographs were relevant to prove that Burris died and the cause of his death. In addition, the photographs were relevant to prove implied malice by showing the enormous impact from a large tractor-trailer truck crashing into a pedestrian, supporting the People's theory that Core drove the truck while impaired in a manner in which the natural and probable consequences were dangerous to human life. (See *People v. Bryant* (2013) 56 Cal.4th 959, 965 ["'We have interpreted implied malice as having "both a physical and a mental component. The physical component is satisfied by the performance of 'an act, the natural consequences of which are dangerous to life.' [Citation.] The mental component is the requirement that the defendant 'knows that his conduct endangers the life of another and . . . acts with a conscious disregard for life.""'"].)[11]

C.    *The Trial Court Did Not Abuse Its Discretion in Admitting the Drug Recognition Expert's Testimony*

"""A person is qualified to testify as an expert if he has special knowledge, skill, experience, training, or education

---

[11]    The People also argue admission of the photographs was not prejudicial because the exhibits were not sent into the jury room. However, the trial court instructed the jury, "These exhibits will be sent into the jury room with you when you begin to deliberate." It is not clear from the record whether the exhibits were later sent into the jury room.

sufficient to qualify him as an expert on the subject to which his testimony relates." (Evid. Code, § 720, subd. (a).) An expert may express an opinion on "a subject that is sufficiently beyond common experience that the opinion of an expert would assist the trier of fact." (Evid. Code, § 801, subd. (a).)'" (*People v. Duong* (2020) 10 Cal.5th 36, 60; accord, *People v. Sanchez* (2016) 63 Cal.4th 665, 675.) "The witness's expertise 'may be shown by any otherwise admissible evidence, including his own testimony.'" (*People v. Morales* (2020) 10 Cal.5th 76, 97 (*Morales*), quoting Evid. Code, § 720, subd. (b); accord, *People v. Nelson* (2016) 1 Cal.5th 513, 536.) "'The trial court has broad discretion in deciding whether to admit or exclude expert testimony [citation], and its decision as to whether expert testimony meets the standard for admissibility is subject to review for abuse of discretion.'" (*Duong*, at p. 60; accord, *Morales*, at p. 97 ["""""The trial court's determination of whether a witness qualifies as an expert is a matter of discretion and will not be disturbed absent a showing of manifest abuse."""""].)

Core contends the trial court abused its discretion in admitting Marks's expert testimony because no foundation was laid for him to testify about drug recognition "reconstruction" based on the observations of other police officers and the facts set forth in the toxicology and other reports.[12] The trial court did not abuse its discretion.

[12] Core concedes defense counsel did not object to Marks's expert testimony. But Core argues his claim of error is not forfeited because his trial attorney provided ineffective assistance of counsel by failing to object. We do not reach whether defense counsel provided ineffective assistance of counsel because the trial court did not abuse its discretion in admitting Marks's expert testimony.

Marks was qualified to testify as a drug recognition expert. He worked as a pharmacy technician for 30 years for the Los Angeles County Probation Department before becoming a college professor of criminal justice. Marks also was a non-sworn reserve officer with the Los Angeles Police Department. In addition, he was a certified drug and alcohol counselor. Marks received 52 hours of intensive training from the Los Angeles Police Department as a drug recognition expert. To obtain his certification, Marks passed a National Highway Traffic Safety Administration Knowledge Exam and a minimum of 12 field certification exams. In addition, Marks was a former drug recognition instructor, which required an additional 40 hours of training.

Although Marks did not describe any training he received specific to drug recognition reconstruction, Marks explained reconstruction is "recognized by the D.R.E. community" as a valid approach to determine "whether a substance or a chemical played a role in an individual's degree of impairment or if they were impaired during a crash." Core fails to provide any support for his contention a drug recognition expert must take specific additional training (or such training exists) for the expert to apply his or her experience to a reconstruction scenario.

Core also asserts Marks did not have sufficient information to form a reconstruction analysis because there was no evidence of poor driving or speeding prior to the accident, no information about Core's pulse rate and pupil size, and no field sobriety test results. But there is no evidence Marks needed this information to form an opinion about Core's impairment. Marks testified to the contrary: "[M]aking a determination of impairment involves a totality of circumstances. It does not hang its hat on any one specific detail such as pulse rate."

Core further argues Marks relied on the deputies' reports to determine whether Core was impaired, but none of the deputies believed Core was impaired or going through withdrawal, including Deputy Quemuel, a drug recognition expert, and Deputy Saucedo, who was previously a drug recognition expert. Core also asserts Marks's testimony is not reliable because Marks believed the deputies observed Core over a period of time, but the reports did not contain any time stamps. Core's challenges to the reliability of Marks's testimony based on the deputies' reports goes to the weight of the evidence, not its admissibility. (*Morales, supra*, 10 Cal.5th at p. 97 ["""""Where a witness has disclosed sufficient knowledge of the subject to entitle his opinion to go to the jury, the question of the degree of his knowledge goes more to the weight of the evidence than to its admissibility."""""]; *People v. Eubanks* (2011) 53 Cal.4th 110, 143 ["questions regarding the validity or the credibility of an expert's knowledge go to the weight of such testimony, not its admissibility"]; see *People v. Veamatahau* (2020) 9 Cal.5th 16, 35, fn. 6 ["it is the jury's role to decide the weight to accord to the expert testimony and 'courts must . . . be cautious in excluding expert testimony' so as not to usurp that role"].)

Core also criticizes Marks for relying on the toxicology report because Marks acknowledged the amount of methamphetamine in Core's blood could fall within the therapeutic range for methamphetamine. But Marks testified he could not determine whether the amount of methamphetamine in Core's blood fell "within or outside of a therapeutic range for [Core] specifically." And he explained an individual "still might be impaired within a therapeutic range." Again, Core's challenges go to the weight of the evidence rather than its

30

admissibility.  (*Morales, supra*, 10 Cal.5th at p. 97; *People v. Eubanks, supra*, 53 Cal.4th at p. 143.)

D.    *Core Forfeited His Challenge to Admission of the Drug Rehabilitation Course Materials and Has Failed To Show Ineffective Assistance of Counsel*

1.    *Proceedings below*

Outside the presence of the jury, defense counsel objected to the admission of course materials from a drug rehabilitation program attended by Core in 2013.  Defense counsel stated, "I would object to have his Prop. 36 classes coming in.  I think it's more prejudicial because the jurors are going to see that if someone is taking Prop. 36 classes, they can draw the conclusion that this person has a drug problem or drug history, possibly a drug addict, even though the classes go back to, I think, four or five plus years ago.  [¶]  So I would ask the court to keep the Prop. 36 classes or any reference to them out of the eyes and ears of the jurors."  The trial court responded, "I am going to allow it.  Again, it goes to his knowledge, which goes to implied malice.  However, I'm going to keep out the fact that—in other words, we can make it somewhat generic.  That in the past he was required to take classes.  In the course of those classes this is what he learned."

Defense counsel then argued, "[T]he People still need to establish a foundation that my client was actually there, he was actually explained these things and not just some documents that are submitted from the class that say, hey, this is our curriculum and Mr. Core was ordered to take these classes.  They still need to lay the foundation that my client was actually there and taught these things."  The trial court replied, "I think that goes to weight, not admissibility."  The court added, "I think . . . when a

31

search warrant is provided for the Prop. 36 class and it shows the defendant was there . . . I think that is all that is required."

Before closing arguments, the parties stipulated: "People's Exhibit 28 are records for defendant Richard Core subpoenaed by the People from Ventura County Behavioral Health, a drug and alcohol rehabilitation program. The exhibit includes both the program's internal records and copies of materials used during the program." Exhibit 28 contains an admission checklist; a questionnaire about Core's prior and current drug use, including methamphetamine; an attendance record reflecting Core's attendance at an intake session, three group sessions, and a discharge session; three progress notes for Core; a discharge summary; and a treatment plan after discharge requiring Core's biweekly attendance at a self-help group. The progress notes show that Core was enrolled in the "Early Recovery" program entitled "Living in Balance." According to the exhibit, the "Early Recovery group is a 12-15 week treatment course." The discharge summary reflects that Core successfully completed the program after two months. The exhibit contains the course materials from three sessions: alcohol and tobacco (session 5); stress and emotional well-being (session 8); and the twelve steps (session 14). Each session contains educational information and exercises to be completed by the participant. The exhibit does not contain course materials for the other sessions.

The People move to augment the record on appeal with "a complete version of People's Exhibit 28," which they contend was the exhibit admitted at trial, pursuant to California Rules of Court, rules 8.155(a) and 8.340(c). Significantly, the proffered version of exhibit 28 contains a section on the effects of drugs on the body, whereas exhibit 28 includes only a session on alcohol and tobacco. But the proffered exhibit is by no means "complete."

32

Unlike exhibit 28, the proffered exhibit does not include the program's internal records showing Core's attendance and progress in the program.

The People argue that the proffered exhibit is the one admitted at trial, noting that the prosecutor in his closing argument referred to the discussion in the course materials about methamphetamine and the downside effects of the drug. It does appear the prosecutor at trial believed the exhibit admitted into evidence and provided to the jury contained session materials on drug use. But that does not mean the prosecutor provided a complete version of the course materials to the court or that the admitted version of the exhibit provided to the jury contained the additional session materials the People now seek to include in the record. To the contrary, it is exhibit 28 (with no relevant materials on drug use) that contains an official green Los Angeles Superior Court exhibit label signed by the clerk indicating it was "admitted in evidence." Because the proffered exhibit was not admitted into evidence or shown to the jury, we deny the People's motion to augment the record.

2. *Core forfeited his claim of error*

Core contends the trial court abused its discretion in admitting the drug rehabilitation course materials because the admitted document does not contain any relevant information on the risks from using methamphetamine and driving. As discussed, the program materials in exhibit 28, in contrast to the proffered exhibit we decline to consider, do not address methamphetamine or its effects, including drowsiness. On this basis, Core argues the course materials had no probative value, and they were prejudicial because they did nothing more than inform the jury that Core previously had a drug issue. Core also

33

asserts the prosecutor failed to lay a proper foundation for admission of the document because there was no evidence the materials were used during the program Core attended.

Although defense counsel initially objected to admission of the course materials, he later stipulated to admission of exhibit 28. (*People v. Seumanu* (2015) 61 Cal.4th 1293, 1328 ["'[W]hen a party enters into a voluntary stipulation, he generally is precluded from taking an appeal claiming defects in the stipulation.'"]; *People v. Gurule* (2002) 28 Cal.4th 557, 623 [same].) Moreover, defense counsel never raised an objection that exhibit 28 did not include any materials on the effects of drug use. Thus, Core has forfeited his claims of error.

### 3. *Core has failed to establish ineffective assistance of counsel*

In the alternative, Core contends his trial attorney's failure to object to admission of the course materials constituted ineffective assistance of counsel. But defense counsel likely made a tactical decision to stipulate to admission of the drug rehabilitation course materials to avoid having a witness from the drug rehabilitation program testify about Core's attendance at the program. Or defense counsel may have been aware that the prosecutor failed to include the course materials on the effects of drug use in the exhibit and decided not to object to admission of the exhibit so as not to alert the prosecutor to the omission. Thus, Core has not met his burden to show defense counsel had "'"no rational tactical purpose"'" for [his] action or omission." (*People v. Mickel, supra*, 2 Cal.5th at p. 198; accord, *People v. Caro, supra*, 7 Cal.5th at p. 514.)

34

E.     *Core Forfeited His Claim of Prosecutorial Misconduct and Has Failed To Show Ineffective Assistance of Counsel*

     1.     *The prosecutor's closing argument*

During his closing argument, the prosecutor argued that the day before the crash Core had "been trying to sleep on the way but he's clearly not getting enough sleep because he [got] his truck stuck on something exiting the parking lot of that strip mall in Valencia." Core had not slept enough "so Officer Powers took him out of service for ten hours." The prosecutor added, "And I don't know how long it takes to get the truck unstuck. . . . But I will tell you what he doesn't do. Is sleep enough."

The prosecutor also asserted Core smoked methamphetamine to stay awake while he was driving, noting Detective Saucedo found two separate eyeglass cases "full of meth" and "it was in his blood the next morning after this crash." The prosecutor added, "[T]hat blood draw comes back positive for meth. It is a lot of meth, actually. It is like 250 nanograms per milliliter of meth in his blood." The "downside effects" of the methamphetamine caused Core to "nod[] off," resulting in Burris being "left in pieces on the sidewalk."

The prosecutor argued Core's behavior did not match "with what someone would do if the steering box failed," and Core did not "hit the brakes until six seconds after the crash." The prosecutor added, "In fact, the truck is stopped at second 3 and he still has got his foot all the way down on the gas. The throttle is all the way down on the floor while the truck is sitting there not moving. And for three seconds he sits there not moving with his foot on the gas. And, oh, puts it on the brake. That is someone that fell asleep."

35

The prosecutor explained "an abiding conviction" as something that is "reasonable to believe." He argued, "And if you say, yeah, I am convinced it happened this way, I'm convinced he smoked meth and it wore off and he nodded off and killed this guy, that's it. You are done. That is all it is. An abiding conviction."

The prosecutor then argued there was implied malice because Core knew "driving a big rig when he [was] exhausted" was dangerous to human life but he "disregarded it." The prosecutor added, "[Core] actually was told that it's dangerous to drive exhausted. The State makes him keep that sleep log. They make him say what he is doing every 15 minutes. The State tells him you cannot drive tired. . . . The [California Highway Patrol] officer said . . . if I even can't tell the last time he slept, you are out for ten hours. That's how important it is. If I am not sure, you are out for ten hours. . . . The day before this happened they told him, it's so important. I can't be sure when you slept. You are out. Go get sleep. . . . [¶] Does he know that he is too tired on that day? What was the evidence? The biggest one to me— second biggest, he forged his sleep log. He faked the log. . . . That is 100 percent proof that he knew [he had not] had enough sleep because he is looking at the log and realizing this isn't right and I'm just going to fake it. [¶] He got the truck stuck the day before. Like I said, that is a big flashing warning sign to him. Don't drive. You are not in a good condition. Don't drive. Officer Powers told him to go to sleep. [¶] He is so tired he drives the wrong route. [¶] And then he told them he was tired. Deputy Efflandt, the blond deputy, said, yeah, I asked him what's up and he told me he hadn't slept enough. He told me that and so that's why I marked that on my report. He said he was too tired."

36

The prosecutor added, "And then the biggest one probably is that he chose to smoke meth.  Why?  To stay awake because he knows he's too tired.  The only reason to smoke that before he gets behind the wheel is he is saying to himself, I'm too tired to drive.  I'm going to smoke some meth to stay awake.  [¶]  But what about when it wears off?  And he knows that, too.  That it's dangerous.  That if this doesn't work, that it's not safe to drive this way.  He knows it because of two things. . . .  And we didn't even put it up on the overhead so you haven't seen any of this yet.  But the first thing we put in was his application to be a truck driver, and on the application it tells him it's dangerous to human life to use drugs to drive.  And that if you do and someone is killed, you can be charged with murder.  [¶]  But, look, that's on his driver's license application.  There is a bunch of stuff on there.  He's going to say, well, maybe he didn't read it.  Maybe he didn't."

The prosecutor then argued, "But in 2013 the defendant went through drug rehab for meth.  We put the whole packet of documents in.  It is like 100 pages.  I won't put them all up here but I want to talk about some of the things that are on it.  So he does this program in 2013.  He spends 64 days, and he successfully completes the program and gets discharged. . . .  And what do they tell him in that drug program?  The same thing Mr. Marks told you about how meth works and what happens with the downside effect.  They tell him about neurotransmitters in your brain and how they work.  That they can be too high or too low or imbalance.  That is homeostasis.  They told him that when you use drugs, a person's neurotransmitters may be temporarily used up.  It is that dry sponge used up.  No more dopamine.  And that the withdrawal symptoms when the meth wears off begins within hours of your last use and includes a bunch of things.

Irritable, anxious, tired and that you can sleep excessively. That you can fall asleep. He knows that. He personally was told that in 2013. And then in 2017 smokes meth to try to stay awake and this is the result."

The prosecutor added, "And any one of those things is enough. . . . Like, you could look and say he forged his sleep log. Yeah, that tells me for sure he didn't sleep enough. I'm done. These are all completely separate things. Pieces of evidence. Any one of them works. There is six of them there. So that's overwhelming evidence that he knew it's dangerous. He knew he is too tired. He did it anyway. That's it. The case is over. He is guilty."

Finally, the prosecutor argued Core showed "a disregard for human life." The prosecutor stated, "[Core] did it in getting behind the wheel when he knew he was too tired and smoking meth to try and stay awake. And it really comes through when they are talking to him after because all he wants to talk about is himself. I don't want to do this. . . . I'm not going to do your tests. I don't want a blood test. Me, me, me, me, me. And then he says, 'My life is over.' Your life is over. Gary Burris's life is over. His life goes on. His life is not over. But what does he say after he kills somebody? 'My life is over.' Me. He cared more about his dog than he cared about killing Gary Burris. And if that's not disregard for human life, I don't know what is."

2. *The prosecutor committed misconduct, but Core forfeited his claim by failing to object*

""""A prosecutor commits misconduct when his or her conduct either infects the trial with such unfairness as to render the subsequent conviction a denial of due process, or involves deceptive or reprehensible methods employed to persuade the

trier of fact.”’” (*People v. Beck and Cruz* (2019) 8 Cal.5th 548, 657; accord, *People v. Hoyt* (2020) 8 Cal.5th 892, 943.) ““‘A defendant’s conviction will not be reversed for prosecutorial misconduct, however, unless it is reasonably probable that a result more favorable to the defendant would have been reached without the misconduct.”’” (*People v. Young* (2019) 7 Cal.5th 905, 932-933; accord, *People v. Tully* (2012) 54 Cal.4th 952, 1010.)

Core asserts multiple grounds of prosecutorial misconduct. He contends the prosecutor misstated the law for implied malice because he told the jury that if they were “convinced [Core] smoked meth and it wore off and he nodded off and killed this guy, that’s it.” But this statement was made in the context of the meaning of an “abiding conviction,” not implied malice. The prosecutor explained implied malice was Core “doing something [he] knows is dangerous and accidentally killing someone while doing it.” The prosecutor later added implied malice is “doing something he knows is dangerous to human life but he does it anyway.” The prosecutor did not misstate the law on implied malice.

Core’s argument the prosecutor falsely stated Core was sleep deprived likewise lacks merit. The prosecutor based his argument on a reasonable inference drawn from Core’s statement to Officer Powers the day before the crash that he had gone to the parking lot to sleep; Officer Powers’s statement Core appeared a “little bit tired”; and Core’s statement to Deputy Efflandt after the crash that “he was just tired from waking up early.” Likewise, the prosecutor had latitude to argue Core’s concern for himself and his dog over that of the victim following the crash showed his disregard for human life in driving while under the influence before the crash. Similarly, the prosecutor did not commit misconduct by arguing Core’s toxicology report showed “a

39

lot of meth" in his blood.  (See *People v. Seumanu, supra,* 61 Cal.4th at p. 1330 ["A criminal prosecutor has much latitude when making a closing argument.  Her argument may be strongly worded and vigorous so long as it fairly comments on the evidence admitted at trial or asks the jury to draw reasonable inferences and deductions from that evidence."]; *People v. Edwards* (2013) 57 Cal.4th 658, 736 [same]; *People v. Panah* (2005) 35 Cal.4th 395, 463 [a prosecutor "'has the right to fully state his views as to what the evidence shows and to urge whatever conclusions he deems proper'"].)

But the prosecutor committed misconduct by arguing facts not in evidence.  "It is well settled that it is misconduct for a prosecutor to base argument on facts not in evidence."  (*People v. Mendoza* (2016) 62 Cal.4th 856, 906; accord, *People v. Rodriquez* (2020) 9 Cal.5th 474, 480 ["'"Statements of supposed facts not in evidence . . . are a highly prejudicial form of misconduct, and a frequent basis for reversal."'"].)  Officer Powers testified he took Core out of service because of the discrepancies in Core's log book, not that the book was forged or fake or he believed Core needed more sleep.  Further, Officer Powers noted Core was fatigued from trying to move his truck from where it was stuck (not a lack of sleep), and he did not direct Core to get more sleep.  Moreover, the prosecutor claimed Core did not depress the brakes until six seconds after the crash, but the electronic data from the truck showed Core applied the brakes one second after the sudden deceleration event, which was not necessarily after the crash.  More troubling, the prosecutor argued Core went to a drug rehabilitation program in 2013 and was "told about how meth works and what happens with the downside effect."  But as discussed, the drug rehabilitation course materials in exhibit 28

40

only focus on the effects of alcohol and tobacco, not methamphetamine.

However, Core forfeited his claim of prosecutorial misconduct by failing to object. "'"As a general rule a defendant may not complain on appeal of prosecutorial misconduct unless in a timely fashion—and on the same ground—the defendant made an assignment of misconduct and requested that the jury be admonished to disregard the impropriety."'" (*People v. Beck and Cruz, supra*, 8 Cal.5th at p. 657; accord, *People v. Hoyt, supra*, 8 Cal.5th at p. 942 [defendant "failed to object to nearly all such instances [of prosecutorial misconduct during his closing argument] and has therefore forfeited these claims on appeal"].) "'The lack of a timely objection and request for admonition will be excused only if either would have been futile or if an admonition would not have cured the harm.'" (*Hoyt*, at pp. 942-943; accord, *People v. Powell* (2018) 6 Cal.5th 136, 171.) Had Core's attorney objected, the trial court could have reminded the jury, as it had instructed, that the attorneys' closing arguments were not evidence, and they should only consider the witness testimony and exhibits as evidence. In addition, as to the drug rehabilitation materials, the court could have specifically instructed the jury that the materials did not include any discussion of the effects of drugs.

3.    *Core has not shown ineffective assistance of counsel*

Core argues his attorney was ineffective for failing to object to the prosecutor's argument. This argument fails because Core has not shown his attorney's failure to object was prejudicial. (See *Strickland v. Washington, supra*, 466 U.S. at p. 697 ["[A] court need not determine whether counsel's performance was deficient before examining the prejudice suffered by the

41

defendant as a result of the alleged deficiencies."]; *People v. King* (2010) 183 Cal.App.4th 1281, 1298 ["If [the defendant] cannot show prejudice, we may reject his claim of ineffective assistance, and need not address the adequacy of trial counsel's performance."].) The defendant "bears the burden of showing prejudice, that is, a 'reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different.'" (*People v. Centeno* (2014) 60 Cal.4th 659, 676, quoting *Strickland, supra*, 466 U.S. at p. 694; accord, *People v. Loza* (2012) 207 Cal.App.4th 332, 350 ["'In demonstrating prejudice, the appellant "must carry his burden of proving prejudice as a 'demonstrable reality,' not simply speculation as to the effect of the errors or omissions of counsel."'"].)

Core has failed to show it is reasonably probable the jury would have reached a result more favorable to him absent the prosecutorial misconduct. Before closing arguments, the trial court instructed the jury, "Evidence is the sworn testimony of witnesses, the exhibits admitted into evidence, and anything else I told you to consider as evidence. [¶] Nothing that the attorneys say is evidence. In their opening statements and closing arguments, the attorneys discuss the case but their remarks are not evidence. Their questions are not evidence. Only the witnesses' answers are evidence." We presume the jury understood and followed the trial court's instructions. (*People v. Flores* (2020) 9 Cal.5th 371, 405; *People v. Frederickson* (2020) 8 Cal.5th 963, 1026.)

Further, the prosecutor did not rely only on the drug rehabilitation course materials as evidence of implied malice. The prosecutor argued Core's statements to the deputies show Core was tired, and he used methamphetamine to continue driving as shown by his positive test for methamphetamine after

the crash. In addition, Core was aware of the dangers of using methamphetamine and driving because his 2009 driver's license application advised him that being under the influence of drugs "impairs the ability to safely operate a motor vehicle," and if he drove while under the influence of drugs and as a result killed a person, he could be charged with murder.

Moreover, the records from the drug rehabilitation program show Core first used methamphetamine at the age of 22 and attended the program because he had an "amphetamine dependence" problem. As someone who previously used methamphetamine, Core had personal experience with the downside effects of methamphetamine. As Marks testified, the downside effect of methamphetamine causes drowsiness, confusion, inability to pay attention, and a lack of coordination. Thus, Core was personally aware of the risks of using methamphetamine and driving.

The prosecutor's other misstatements were less significant. The prosecutor attributed to Officer Powers a belief that Core was tired, but Core did tell Deputy Efflandt he was "tired from waking up early." And both officers encountered Core after he had driven off route and, although he was an experienced truck driver, had gotten his truck stuck on the driveway to a parking lot, blocking a road lane. Although there was no evidence the log book was forged, there was evidence it had discrepancies that led Officer Powers to take Core out of service for 10 hours. As to when Core depressed the brakes, whether he did so one second or six seconds after the sudden deceleration event was not significant. The principal issue at trial was whether Core acted with implied malice by driving under the influence of methamphetamine. On this record, it is not reasonably probable

that a result more favorable to Core would have been reached absent the prosecutorial misconduct.

F.    *Substantial Evidence Supports Core's Conviction of Murder*
       1.    *Standard of review*

"When a defendant challenges the sufficiency of the evidence for a jury finding, we review the entire record in the light most favorable to the judgment of the trial court.  We evaluate whether substantial evidence, defined as reasonable and credible evidence of solid value, has been disclosed, permitting the trier of fact to find guilt beyond a reasonable doubt." (*People v. Vargas* (2020) 9 Cal.5th 793, 820; accord, *People v. Penunuri* (2018) 5 Cal.5th 126, 142 ["'To assess the evidence's sufficiency, we review the whole record to determine whether *any* rational trier of fact could have found the essential elements of the crime or special circumstances beyond a reasonable doubt.'"].) "'"Conflicts and even testimony [that] is subject to justifiable suspicion do not justify the reversal of a judgment, for it is the exclusive province of the trial judge or jury to determine the credibility of a witness and the truth or falsity of the facts upon which a determination depends.  [Citation.]  We resolve neither credibility issues nor evidentiary conflicts; we look for substantial evidence.'"'" (*Penunuri*, at p. 142; accord, *People v. Mendez* (2019) 7 Cal.5th 680, 703.)

"'"The standard of review is the same in cases in which the prosecution relies mainly on circumstantial evidence.'"'" (*People v. Vargas, supra*, 9 Cal.5th at p. 820; accord, *People v. Rivera* (2019) 7 Cal.5th 306, 324 (*Rivera*).) "'We presume in support of the judgment the existence of every fact the trier of fact reasonably could infer from the evidence.  [Citation.]  If the circumstances reasonably justify the trier of fact's findings,

44

reversal of the judgment is not warranted simply because the circumstances might also reasonably be reconciled with a contrary finding.'" (*People v. Westerfield* (2019) 6 Cal.5th 632, 713; accord, *People v. Penunuri, supra*, 5 Cal.5th at p. 142 ["'A reversal for insufficient evidence "is unwarranted unless it appears 'that upon no hypothesis whatever is there sufficient substantial evidence to support'" the jury's verdict.'"].)

2.   *Substantial evidence supports the jury's finding of implied malice*

"Murder is the unlawful killing of a human being . . . with malice aforethought." (Pen. Code, § 187, subd. (a).) Malice may be expressed or implied. (*Id.*, § 188.) "'Malice is implied when the killing is proximately caused by "'an act, the natural consequences of which are dangerous to life, which act was deliberately performed by a person who knows that his conduct endangers the life of another and who acts with conscious disregard for life.'"'" (*People v. Smith* (2018) 4 Cal.5th 1134, 1165; accord, *People v. Gonzalez* (2018) 5 Cal.5th 186, 197.) "[A] finding of implied malice depends upon a determination that the defendant actually appreciated the risk involved, i.e., a subjective standard." (*People v. Watson* (1981) 30 Cal.3d 290, 296-297.)

Core contends there was not substantial evidence he was subjectively aware his actions were dangerous to human life and that he deliberately acted with conscious disregard for human life. This contention lacks merit. Core is correct the drug rehabilitation course materials in exhibit 28 do not discuss the "downside effects" of methamphetamine or the dangers of using methamphetamine and driving. But as discussed, the program records show Core first used methamphetamine at the age of 22, and he attended the drug rehabilitation program in 2013 because

45

he had an amphetamine dependence problem. Having previously used methamphetamine, Core personally experienced methamphetamine's downside effects, as described by Marks, and he was advised in his 2009 commercial driver's license application that driving while under the influence of drugs was dangerous to human life, and if he caused someone's death, he could be charged with murder. Substantial evidence supports the jury's finding of implied malice.[13]

G.   *The Trial Court Complied with Its Obligations Under* Pitchess

1.   *Core's* Pitchess *motion*

On September 20, 2019 Core filed a *Pitchess* motion pursuant to Evidence Code section 1043, seeking discovery of Officer Powers's personnel records concerning "[a]ll complaints . . . relating to violation of constitutional rights, fabrication of charges, fabrication of evidence, false arrest, perjury, dishonesty, writing of false police reports, and any other evidence of misconduct amounting to moral turpitude." On October 4, 2019 the trial court granted the motion, ordering disclosure of any information concerning Officer Powers's dishonesty. The court conducted an in camera hearing and found no disclosure was required.

---

[13]   Core contends he suffered cumulative prejudice from multiple errors. Because we reject Core's claims of error (or find no prejudice), there was no cumulative prejudice. (*People v. Powell, supra* 6 Cal.5th 136, 194 [no cumulative prejudice where "[a]ny errors, actual or arguable, were minor"]; *People v. Edwards, supra,* 57 Cal.4th 658, 746 [no cumulative prejudice because there was no error, or if assuming error, there was no prejudice].)

46

2. *The trial court did not abuse its discretion*

"'When a defendant shows good cause for the discovery of information in an officer's personnel records, the trial court must examine the records in camera to determine if any information should be disclosed.'" (*Rivera, supra*, 7 Cal.5th at p. 338; accord, *People v. Anderson* (2018) 5 Cal.5th 372, 391.) "'The court may not disclose complaints over five years old, conclusions drawn during an investigation, or facts so remote or irrelevant that their disclosure would be of little benefit.'" (*Rivera*, at p. 338; accord, *People v. Winbush* (2017) 2 Cal.5th 402, 424; see Evid. Code, § 1045, subd. (b).) "'*Pitchess* rulings are reviewed for an abuse of discretion.'" (*Rivera*, at p. 338; accord *Anderson*, at p. 391.)

Core requests we review the sealed portion of the record, which includes the transcript of the in camera hearing. The People do not object to our review. Core's request for an independent review of the sealed record is proper. (*People v. Anderson, supra*, 5 Cal.5th at p. 391 ["Defendant properly asks us to review the sealed record of the in camera hearing to determine whether the court erroneously failed to provide discovery that he should have received."]; *Rivera, supra*, 7 Cal.5th 306, 338-339 [court reviewed sealed transcript of both in camera hearings and sealed exhibits].)

We have reviewed the sealed record. The trial court did not abuse its discretion in concluding there was no discoverable information to disclose to Core. (See *People v. Anderson, supra*, 5 Cal.5th at p. 391; *People v. Winbush, supra*, 2 Cal.5th at p. 424.)

**DISPOSITION**

The judgment is affirmed.

FEUER, J.

We concur:

SEGAL, Acting P. J.

McCORMICK, J.*

---

* Judge of the Orange County Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.